UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

FULTON BELLOWS, LLC,                    )
                                        )
        *Plaintiff,*                    )
v.                                      )        No. 1:08-cv-107
                                        )        *Edgar / Lee*
FEDERAL INSURANCE COMPANY,              )
                                        )
        *Defendant.*                    )


**MEMORANDUM**

Plaintiff Fulton Bellows, LLC, ("FBLLC") brings this action for breach of contract,

violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*

("TCPA"), and bad faith refusal to pay an insurance claim pursuant to Tenn. Code Ann. § 56-7-

105. Defendant Federal Insurance Company ("Federal Insurance") moves for summary

judgment dismissal of Plaintiff's claims. [Court Doc. No. 23]. Plaintiff opposes the motion.

[Court Doc. No. 26].

Plaintiff brought its original complaint in the Circuit Court of Tennessee at Hamilton

County. [Court Doc. No. 1-3, Complaint]. Federal Insurance subsequently removed the action

to this court on the basis of diversity jurisdiction based on the complete diversity of the parties

pursuant to 28 U.S.C. § 1332 and 28 U.S.C. §§ 1441, 1446. [Court Doc. No. 1].

## I.      Background

Many of the facts in this matter are undisputed by the parties. Where there are

discrepancies, the court will make note of the parties' disagreement. Plaintiff's Complaint

asserts the following facts. FBLLC was incorporated on July 30, 2004. *See* Complaint. The

company formed its existence after purchasing the assets of Fulton Bellows & Components, Inc.

("FBCI"), a Knoxville, Tennessee manufacturing company that had entered into bankruptcy.

FBCI had a Forefront Portfolio liability insurance policy purchased from Federal Insurance. *Id.*

Prior to beginning operations, FBLLC President, Roger Clark, applied for directors' and

officers' (D&O) liability insurance coverage with Defendant Federal Insurance.

On August 3, 2004 FBLLC bought the assets of FBCI through the United States

Bankruptcy Court for the Eastern District of Tennessee. Complaint. According to the Plaintiff

all of the FBCI employees were terminated on August 3, 2004. *See* [Court Doc. No. 35-2,

Declaration of E. Roger Clark ("Clark Decl."), ¶ 3]. Mr. Clark stated in his declaration that:

> On August 4, 2004 I hired some members of management to become employed at
> [FBLLC]. I caused [FBLLC] to place advertisements in local newspapers on
> August 4, 2004, and began to accept applications for employment. Interviewing
> and hiring of employees for the [FBLLC] continued for several months. No
> hiring decisions for non-management personnel (including all of the <u>Gaskey</u>
> plaintiffs) were made until after August 6, 2004.

Clark Decl., ¶¶ 5-6.

 Following receipt of a completed application, Federal Insurance issued a Forefront

Portfolio Policy No. 6801-2944 (the "Policy") providing for various liability coverages,

including an Employment Practices Liability ("EPL") coverage, for FBLLC. The Policy was

dated August 6, 2004 and was renewed both on August 6, 2005 and August 6, 2006. Complaint,

¶ 7. The parties dispute whether August 6, 2004 is the appropriate starting date of the Policy.

Although they agree the Policy is dated August 6, 2004, FBLLC contends that the underwriter at

Federal Insurance represented to FBLLC that coverage would be bound as soon as she received

the completed application and answers to her questions. FBLLC contends that, through an email

exchange, FBLLC complied with her requests on August 3, 2004 and that coverage under the

Policy should have started at that date or on August 4, 2004. *See e.g.* Clark Decl., ¶¶ 8-9; [Court

Doc. No. 37, Declaration of Robert Davidson ("Davidson Decl."), ¶¶ 4, 7].

The Complaint asserts that FBLLC began to hire employees in August of 2004 for its Knox County operations. Many of the employees hired had worked for FBCI. On May 28, 2005, a former employee of FBCI, Calvin Gaskey, along with many others, filed charges of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") with the Equal Employment Opportunity Commission ("EEOC"). *See* [Court Doc. Nos. 23-3, 23-4, 23-5 ("EEOC Charges")]. The EEOC Charges, filed on behalf of dozens of employees all allege the following facts:

> Fulton Bellows & Components, Inc. reorganized through bankruptcy proceedings and emerged as Fulton Bellows, LLC under the control and direction of Morris Capital. Applications for re-hire of former corporate employees were not sent out to eligible candidates over age 40, applications from former employees over age 40 were discouraged, and such applications from former employees over age 40 were rejected, including applications and assignments from temporary agencies. More than 170 former employees, all over the age of 40 years, lost their jobs as a result of Fulton Bellows' hiring practices. On information and belief, it is alleged that this was a direct decision to only continue the business with younger workers, or the result of the disparate impact of other employment screens intended to screen out older workers or with disparate impact on such workers, used during the re-hiring process, individuals and entities known to be involved in the unlawful employment practices complained of herein are Fulton Bellows & Components, Inc., and its successor entity, Fulton Bellows LLC . . . .

EEOC Charges. The EEOC Charges assert that the earliest date of discrimination was August 2, 2004. The letter from the attorney representing the former employees states that "[t]he unlawful employment practice charged herein – age discrimination – took place on either August 2, 2004 or August 3, 2004, the date of Fulton Bellows, LLC's hiring decisions . . ." [Court Doc. No. 23-3]. The letter further asserts that "[a]nnouncements of hires and rejections of hires were made on August 2 and 3, 2004." *Id.*

On July 14, 2005 attorneys for FBLLC filed a response to the EEOC Charges. *See*

[Court Doc. No. 23-7]. On August 29, 2005 the EEOC issued a dismissal of the EEOC Charges

and a Notice of Right to Sue. [Court Doc. No. 23-8]. On November 23, 2005, Calvin Gaskey,

along with many other former employees of FBCI ("Discrimination Plaintiffs") filed suit in the

United States District Court for the Eastern District of Tennessee at Knoxville. [Court Doc. No.

23-9, ("Discrimination Complaint")]. The Discrimination Complaint asserts that "Group 1

Employees are those employees who were released from employment by Fulton Bellows &

Components, Inc. on or about August 2, 2004, and later unsuccessfully sought employment with

Fulton Bellows, LLC." Discrimination Complaint. The Discrimination Complaint also includes

allegations of discrimination by other groups of employees: those who were terminated on

August 2, 2004 or prior to that date and who did not seek employment with FBLLC because they

believed it would be futile and those who were terminated prior to August 2, 2004 and sought

employment with FBLLC but were unsuccessful.

The Discrimination Complaint asserts in part:

On or about August 2, 2004, Fulton Bellows & Components, Inc. laid off all of its
regular employees, including those plaintiffs identified herein as belonging to
groups 1 and 2. Almost immediately thereafter, Fulton Bellows, LLC received
control, and on information and belief title, to substantially all of Fulton Bellows
& Components, Inc.'s assets. Fulton Bellows, LLC, thereafter refused to hire
back most former employees of Fulton Bellows & Components, Inc., or even to
permit such workers back as workers employed through temporary employment
agencies.

Certain former employees of the Fulton Bellows enterprise, including those
plaintiffs identified herein as belonging to groups 1 and 3, attempted to re-apply
for jobs with the Fulton Bellows enterprise, and were informed that the
management of Fulton Bellows enterprise would not re-hire former employees,
either directly or through temporary employment agencies. Other former
employees of the Fulton Bellows Enterprise, including those plaintiffs identified
herein as belonging to groups 2 and 4, did not attempt to re-apply for jobs with
the Fulton Bellows enterprise, because they reasonably and accurately believed
that such attempts would be futile. Such policies and practices as alleged herein

-4-

had a disparate impact upon workers over the age of 40 years, and were not based
on any reasonable factor other than age.

Discrimination Complaint, ¶¶ 14-15. The Discrimination Complaint also asserted that FBLLC

and FBCI were engaged in the same business and were part of the same business "enterprise"

and were merely alter egos of one another. *Id.* at ¶ 10. It further alleged that:

> [s]ubstantial negotiations were undertaken by the Fulton Bellows enterprise to
> eliminate older employees, as described above, prior to August 2, 2004, including
> but not limited to requesting that unionized workers accept large pay cuts and
> changes in insurance benefits, refusing to negotiate with union representatives in
> good faith regarding these requests, termination and layoffs of older workers
> including plaintiffs identified herein as belonging to groups 3 and 4, and
> eventually seeking reorganization of the Fulton Bellows enterprise through resort
> to the Federal Bankruptcy courts.

Discrimination Complaint, ¶ 13.

On May 2, 2006 Robert Davidson, a Senior Vice President of FBLLC, provided Federal

Insurance with notice of a National Labor Relations Board ("NLRB") Complaint that appears to

be related to the circumstances described in the Discrimination Complaint, as well as a copy of

the EEOC Notice of Right to Sue and FBLLC's answer to the Discrimination Complaint. [Court

Doc. No. 23-10]. The letter enclosed correspondence from FBLLC's attorney regarding the facts

surrounding the NLRB and Discrimination Complaint. The attorney letter states:

> On payroll period ending date August 6, 2004, FBCI employed 123 employees in
> the bargaining units. Immediately before the transfer in ownership FBCI
> terminated all of its employees. Over the next several weeks and months, FBLLC
> invited applications for employment. In particular, all former FBCI employees
> were invited to apply. By May of 2005, FBLLC had hired a substantial
> representative complement of workers. Out of the 88 employees in positions
> which would have been included in the previous bargaining units, only 25
> employees used to work for FBCI.

[Court Doc. No. 23-10, p. 6].

On June 16, 2006 Federal Insurance provided notice to FBLLC that it would not be

providing any defense to the Discrimination Complaint because the Discrimination Complaint

alleged wrongful acts which arose prior to the date of the Policy, August 6, 2004. [Court Doc.

No. 23-11].

On March 20, 2007 a district court judge in this district dismissed the claims of the

Discrimination Plaintiffs on summary judgment. *Gaskey v. Fulton Bellows, LLC*, No.

3:05cv540, 2007 WL 869621 (E.D. Tenn. Mar. 20, 2007). The court determined that "FBCI

filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 10, 2003,

in the United States Bankruptcy Court for the Eastern District of Tennessee, Northern Division.

An order was entered by the Bankruptcy Court on July 29, 2004, authorizing the sale of assets of

FBCI to FBLLC. FBCI laid off all of its remaining employees on or about August 2, 2004.

FBLLC acquired the assets of FBCI on or about August 3, 2004." *Id.* at * 1. The court further

explained:

> Through articles and job postings in the *Knoxville News Sentinel*, FBLLC invited
> all former FBCI employees, as well as the public at large, to apply for
> employment. Through the initial start-up phase of FBLLC, applications for
> employment were accepted and screened through the State Career Office of the
> Tennessee Department of Employment Security (DES). Applicants completed a
> general/generic employment application form used by DES.
>
> After the initial start-up phase, applications were accepted and screened directly
> at the FBLLC facility. FBLLC used its own application for employment form.
> Neither the DES's employment application nor FBLLC's application requested
> information concerning an applicant's age, prior union membership or history of
> healthcare insurance costs.
>
> Plaintiffs applied for employment during August, September and October of
> 2004. During those months, 507 individuals applied for employment with
> FBLLC.

*Id.* at *2.

The court articulated the Discrimination Plaintiffs' claim as follows: "Plaintiffs alleged

-6-

that FBLLC's refusal to hire former FBCI employees, who were all over the age of 40, had a disparate impact on older applicants in violation of the ADEA." *Id.* at *5 (relying on 29 U.S.C. § 623(a)(1)). The court determined that the two groups of employees who had failed to apply for employment with FBLLC lacked standing to bring ADEA claims and dismissed their claims. The court then held that the remaining plaintiffs could not "show a significant statistical disparity disfavoring older workers," and granted summary judgment for FBLLC. *Id.* at *9.

  B. *Relevant Policy Terms*

  The Policy clearly states that the Policy Period is from 12:01 A.M. on August 6, 2004 to 12:01 A.M. on August 6, 2005. Policy, p. 3. In the definitions section of the Policy, "Potential Employment Claim" is defined as follows:

> a complaint or allegation of a Wrongful Act in connection with Discrimination, Harassment, Retaliation, Workplace Tort or Wrongful Employment Decision that does not constitute an Employment Claim but which may subsequently give rise to an Employment Claim brought by or on behalf of an Insured Person that is lodged with the Insured Organization's human resource department . . .

Policy, pp. 6-7. "Related Claims" means "all Claims for Wrongful Acts based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." Policy, p. 7. The Policy further states that "[a]ll Related Claims will be treated as a single Claim made when the earliest of such Related Claims was first made, or when the earliest of such Related Claims is treated as having been made . . ." Policy, p. 10.

  Under the EPL coverage section of the Policy, the Declarations section states as follows:

> THIS COVERAGE SECTION PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE

REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND
"DEFENSE COSTS" WILL BE APPLIED AGAINST THE DEDUCTIBLE
AMOUNT.

Policy, p. 33. The EPL coverage states: "The Company shall pay Loss on behalf of the Insureds

resulting from any Employment Claim first made against such Insureds during the Policy Period,

or any applicable the [sic] Extended Reporting Period, for Wrongful Acts." Policy, p. 34. Loss

is defined as including "Defense Costs." *Id.* at p. 36. "Defense Costs," in turn include

"attorneys' fees and experts' fees" *Id.* at p. 34. "Employment Claim" is defined as follows:

> (1)    any of the following:
>         (a)     a written demand for monetary damages or non-monetary relief,
> including but not limited to a written demand for reinstatement, reemployment or
> re-engagement;
>         (b)     a civil proceeding commenced by the service of a complaint or
> similar pleading;
> (c)    an arbitration proceeding; or
> (d)    a formal administrative or regulatory proceeding or tribunal proceeding,
> commenced by the filing of a notice of charges, formal investigative order or
> similar document, including, but not limited to, any Equal Employment
> Opportunity Commission proceeding or any other similar governmental agency
> located anywhere in the world; . . .
>
> which is brought and maintained by or on behalf of any past, present or
> prospective Employee, Executive or Independent Contractor . . . , against any
> Insured for a Wrongful Act in connection with any actual or alleged Breach of
> Employment Contract, Discrimination, Harassment, Retaliation, Workplace Tort
> or Wrongful Employment Decision . . .

Policy, p. 35. A "Wrongful Employment Decision" is defined as "the actual, alleged or

constructive termination, dismissal, or discharge of employment, demotion, denial of tenure, or

failure or refusal to hire or promote." Policy, p. 38. A "Wrongful Act" is defined as "any error,

misstatement, misleading statement, act, omission, neglect, or breach of duty committed,

attempted, or allegedly committed or attempted by an Insured Organization or by any Insured

Person in his or her capacity as such, or any matter claimed against any Insured Person solely by

-8-

reason of his or her status as such." *Id.* Discrimination under the Policy means:

> any violation of employment discrimination laws including any actual, alleged or constructive employment termination, dismissal, or discharge, employment demotion, denial of tenure, modification of any term or condition of employment, any failure or refusal to hire or promote, or any limitation, segregation or classification of any Employee or applicant for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise affect his or her status as an Employee based on such person's race, color, religion, creed, age, sex, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference . . . or other status that is protected pursuant to any federal, state, or local statutory law or common law anywhere in the world.

Policy, p. 34.

The EPL section of the Policy also contains a "Prior Acts Exclusion" which states: "[i]n consideration of the premium charged, it is agreed that no coverage will be available under Insuring Clause(s) I.(A) of the Coverage Section identified above for any Claim based upon, arising from, or in consequence of any Wrongful Act committed, attempted, or allegedly committed or attempted in whole or in part prior to August 6, 2004." Policy, p. 46.

The Policy also requires that "[a]ny Insured shall, as a condition precedent to exercising their rights under any Liability Coverage Section, give to the Company written notice as soon as practicable of any Claim." Policy, p. 10.

### C.  *Purchase of Extended Coverage for FBCI*

Plaintiff contends that it purchased an Extended Reporting Period Endorsement for FBCI to ensure that there would be no gap in EPL coverage for FBLLC. Plaintiff asserts:

> [FBLLC] paid an additional $14,900.00 to Federal Insurance Co. for "tail" coverage and extended the reporting period on the EPL policy of [FBCI] from March 31, 2005 through August 4, 2006. . . . In addition, [FBLLC] purchased its own insurance coverages including another EPL policy from Chubb through its affiliate Federal Insurance Company. [FBLLC] wanted to make sure that there was no gap in coverage and that [FBLLC], its assets and personnel, would be

-9-

protected against claims made against [FBLLC] and [FBCI].

[Court Doc. No. 35-4, Declaration of Tim Morris, Jr. ("Morris Decl."), ¶¶ 5-7]. Plaintiff submits an Election of Extended Reporting Period Endorsement that Federal Insurance issued to FBCI. [Court Doc. No. 35-4, Ex. A]. The Election document states: "In consideration of an additional premium of $14,900.00 charged, the Insureds have elected to purchase the Extended Reporting Period from 3/31/2005 to 8/4/2006 in accordance with Section IV Extended Reporting Period of the General Terms and Conditions Section." *Id.* Although the Election document appears to amend the terms of an EPL policy issued to FBCI, the record does not include a copy of any prior EPL policy that was issued to FBCI.

## II.     Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

## III.     Analysis

### A.     Breach of Contract

### 1.     Prior Acts Exclusion

The parties do not dispute that Tennessee law applies in this diversity action. Under Tennessee law the question of whether an insurer has a duty to defend is a question of law. *See St. Paul Fire and Marine Ins. Co. v. Torpoco*, 879 S.W.2d 831 (Tenn. Sup. Ct. 1994); *Morgan v.*

*Utica Mut. Ins. Co.*, 2000 WL 1276755, 229 F.3d 1153, *2 (6th Cir. Aug. 30, 2000)

(unpublished). Issues involving a duty to defend may be resolved on summary judgment if there

are no disputes regarding any material facts. *See Travelers Indem. Co. of America v. Moore &*

*Associates, Inc.*, 216 S.W.3d 302, 305 (Tenn. Sup. Ct. 2007). In addition, "[t]he duty to defend

depends solely on the allegations of the complaint filed against the insured, and an insurer must

provide a defense unless all of the allegations fall within an exception. This does not mean,

however, that the insured's right to defense will be determined solely by the third-party

plaintiff's choice of words; the court must look to the substance of the complaint to determine if

the matter fell so clearly within an exception that there was no duty to defend." *Morgan*, 2000

WL 1276755 at *2 (citing *Torpoco*, 879 S.W.2d at 834-35 and *Aetna Casualty & Sur. Co. v.*

*Sunshine Corp.*, 74 F.3d 685, 688 (6th Cir. 1996)). Under Tennessee law,

> the insurer has a duty to defend when the underlying complaint alleges damages
> that are within the risk covered by the insurance contract and for which there is a
> potential basis for recovery. The duty to defend arises if even one of the
> allegations is covered by the policy. The duty to defend is broader than the duty
> to indemnify because the duty to defend is based on the facts alleged, while the
> duty to indemnify is based upon the facts found by the trier of fact. Any doubt as
> to whether the claimant has stated a cause of action within the coverage of the
> policy is resolved in favor of the insured.

*Moore & Assoc., Inc.*, 216 S.W.3d at 305 (citations omitted); *see also, Drexel Chemical Co. v.*

*Bituminous Ins. Co.*, 933 S.W.2d 471, 480 (Tenn. Ct. App. 1996) (noting that "[a]n insurer may

not properly refuse to defend an action against its insured unless 'it is plain from the face of the

complaint that the allegations fail to state facts that bring the case within or potentially within the

policy's coverage'") (quoting *Glen Falls Ins. Co. v. Happy Day Laundry, Inc.*, 19784 T.D., 1989

WL 91082 (Tenn. Ct. App. Aug. 14, 1989)).

In *Tata v. Nichols* the Tennessee Supreme Court explained the basic rules of insurance

contract interpretation:

> The analysis used in construing insurance policies is well settled. "Insurance
> contracts like other contracts should be construed so as to give effect to the
> intention and express language of the parties." Words in an insurance policy are
> given their common and ordinary meaning. Where language in an insurance
> policy is susceptible of more than one reasonable interpretation, however, it is
> ambiguous. Where the ambiguous language limits the coverage of an insurance
> policy, that language must be construed against the insurance company and in
> favor of the insured.

848 S.W.2d 649, 650 (Tenn. Sup. Ct. 1993) (quoting *Blaylock & Brown Construction, Inc. v.

AIU Ins. Co.*, 796 S.W.2d 146, 149 (Tenn. Ct. App. 1990)) (other citations omitted). In addition,

an "insurance contract 'must be interpreted fairly and reasonably, giving the language its usual

and ordinary meaning.'" *Moore & Assocs., Inc.*, 216 S.W.3d at 306 (quoting *Standard Fire Ins.

Co. v. Chester-O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 7 (Tenn. Ct. App. 1998)).

Further, Tennessee courts have noted that: "[c]lauses excluding coverage should be

strictly construed against the insurer but in light of their apparent purpose. When the purpose of

an exclusion can be ascertained, the courts should avoid construing the language of the exclusion

so narrowly that its purpose is undermined." *National Ins. Ass'n v. Simpson*, 155 S.W.3d 134,

138 (Tenn. Ct. App. 2004) (citing *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. Sup.

Ct. 1991); *Chester-O'Donley & Assocs., Inc.*, 972 S.W.2d at 8) (other citations omitted).

The parties have not directed this court's attention to Tennessee cases interpreting prior

act exclusions as they relate to EPL coverage. Nor has this court located any such cases.

However, the court concludes that the Tennessee Supreme Court's opinion in *Allstate Ins. Co. v.

Watts* provides some useful guidance regarding Tennessee courts' interpretation of insurance

policy exclusions. 811 S.W.2d 883 (Tenn. Sup. Ct. 1991). In *Watts* the insurer brought a

declaratory judgment action against the policyholder seeking a declaration from the court that it

did not need to provide insurance coverage under its homeowner policy. The policy included an exclusion for injuries arising out of the maintenance of a motor vehicle. *Id.* at 884. The injury at issue occurred while the insured was helping a friend replace brakes on his truck which was partially parked in the insured's garage. Another friend stopped by and offered to help by using his blow torch to remove the lug nuts. *Id.* Before turning on the torch, the friend asked the insured whether anything flammable was in the garage. The insured responded that there was nothing flammable present. *Id.* As the friend attempted to cut a bolt off with the torch, some sparks flew around the garage igniting a pan of flammable liquid under the truck. *Id.* The friend informed the insured about the flaming liquid, and the insured picked up the pan and tried to remove it. The liquid splashed onto the friend and ignited his clothing, causing him serious injury. *Id.* The friend sued the insured for negligence, and the insurer then filed its declaratory judgment action.

The insurer argued that "the phrase 'arising out of' is sufficiently broad that it denotes the existence of *any* causal relationship." 811 S.W.3d at 885. In beginning its analysis, the Supreme Court noted "[i]t is well settled that exceptions, exclusions, and limitations in insurance policies must be construed against the insurance company and in favor of the insured." *Id.* at 886 (citing *Travelers Insur. Co. v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 367 (Tenn. Sup. Ct. 1973)). The court then continued:

> While there are a variety of ways to analyze the problem before us, this Court is persuaded that there should be coverage in a situation such as in the instant case, where a nonexcluded cause is a substantial factor in producing the damage or injury, even though an excluded cause may have contributed in some form to the ultimate result and, standing alone, would have properly invoked the exclusion contained in the policy. It is true that "arising out of" is an extremely broad phrase, so broad, in fact, that it is difficult to conceive of a rule that draws a justifiable line between coverage and no coverage at any reasonable point. . . .

The problem with [the insurer's] approach is that cause and effect extend to near
infinity.  It is for this reason that we reject the "chain of events" theory of
application which appears to hinge on a "but-for" theory of causation utilized by
the Court of Appeals and urged by [the insurer]. . . .

In summary, we hold that an insurer should not be excused from its obligation
under a homeowner's policy unless it has been determined that the loss being
complained of did not result in substantial part from a risk for which it provided
coverage and collected a premium.  We reject the contention that there can be no
coverage when the chain of events leading to the ultimate harm is begun by an
excluded risk, concluding instead that coverage cannot be defeated simply
because excluded risks might constitute an additional cause of the injury.

*Id.* at 888.

In this action Federal Insurance denied coverage for the cost of defending the

Discrimination Claim based on the prior acts exclusion of the Policy.  It is true that the EEOC

Charges indicate that the earliest date of discrimination is August 2, 2004, but the EEOC

Charges also indicate FBCI is an additional respondent.  *See* EEOC Charges.  The

Discrimination Complaint alleges that FBCI and FBLLC, through their "enterprise" "desired to

eliminate workers who were either members of a union or whose healthcare insurance costs were

perceived to be too high."  *See* Discrimination Complaint, ¶ 11.  The Discrimination Complaint

further alleges a kind of discrimination conspiracy on the part of FBCI and FBLLC prior to

August 2, 2004 that would "eliminate older workers."  *See id.* at ¶ 13.  Plaintiffs then assert in

their Discrimination Complaint that FBCI laid off all of its employees on August 2, 2004 and

that FBLLC "*thereafter* refused to hire back most former employees" of FBCI.  *Id.* at ¶ 14.

Based on the facts determined by the district court, it appears that FBLLC did not form

its own corporate existence until July 29, 2004 when the bankruptcy court authorized the sale of

FBCI's assets to FBLLC.  2007 WL 869621 at *1.  The court also determined that FBCI laid off

all of its workforce on or about August 2, 2004.  *Id.*  FBLLC accepted applications for

-15-

employment in August, September, and October.  *Id.* at *2.

Although Federal Insurance appears to be resting its argument on the date of August 2, 2004 mentioned in the EEOC Charges and in the Discrimination Complaint, it appears that the Discrimination Plaintiffs, as well as the district court found that August 2, 2004 was the date that FBCI terminated its employees.  FBCI was named as a defendant in the Discrimination Complaint.  August 2, 2004 is the earliest date of discrimination alleged, but this date relates to FBCI's discriminatory terminations, not FBLLC's discriminatory failure to hire.  Only some time "thereafter" does the Discrimination Complaint allege that all 138 Discrimination Plaintiffs were either not hired or discouraged from applying to work at FBLLC.  There appears to be a genuine issue of material fact regarding whether FBLLC actually failed to hire the Discrimination Plaintiffs sometime after August 6, 2004.[1]  This court must view the facts in the light most favorable to the Plaintiff on summary judgment, and it concludes that there is some evidence that the hiring decisions were not made until after August 6, 2004.  *See* 2007 WL 869621 at *2.

Federal Insurance responds that it does not matter that the discriminatory hiring might have taken place after August because the Discrimination Complaint alleges that FBLLC engaged in a discriminatory conspiracy to eliminate older workers prior to August 2, 2004.  It is true that the Discrimination Complaint alleges a vague discrimination conspiracy between

---

[1]  Although FBLLC asserts that the Policy should have started on August 3, 2004 based on the intent of the parties, the Policy clearly states that it begins on August 6, 2004.  There is no evidence in the record that Federal Insurance ever intended the Policy to begin on any other date. Merely because FBLLC executives responded to questions from Federal Insurance and filed their application does not mean the Policy should begin the very minute the electronic mail message was sent.  Therefore, the court concludes that the Policy began on August 6, 2004.

-16-

FBLLC and FBCI. However, as the district court found, the only actionable claim of discrimination against FBLLC was its alleged failure to hire applicants on the basis of age in violation of the ADEA. *See* 2007 WL 869621 at *6-8. A mere "desire to eliminate" older workers is simply not an actionable claim under the ADEA.

Tennessee law requires that "exceptions, exclusions, and limitations in insurance policies must be construed against the insurance company and in favor of the insured." *Watts*, 811 S.W.3d at 886. Federal Insurance suggests that the "conspiracy" was a "related claim" to the ADEA claims alleged in the Discrimination Complaint, making the ADEA claims prior acts excluded by the Policy. However, the Tennessee Supreme Court in *Watts* suggested that there is a limit to the extent to which causation analysis can be stretched. In that case, the Tennessee Supreme Court rejected "the contention that there can be no coverage when the chain of events leading to the ultimate harm is begun by an excluded risk, concluding instead that coverage cannot be defeated simply because excluded risks might constitute an additional cause of the injury." *Id.* at 888. It is possible that the alleged discriminatory failure to hire, a claim which the district judge dismissed at summary judgment, "arose from" an alleged discriminatory conspiracy, but as the Supreme Court concluded in *Watts*, this court concludes that this argument stretches the "arising from" language too far. The direct cause of the Discrimination Plaintiffs' ADEA claims was FBLLC's failure to hire them sometime after their August 2nd dismissals from FBCI. The court concludes that the facts as alleged in the Discrimination Complaint demonstrate that there is a genuine issue of material fact regarding coverage under the Policy. *See Moore & Assoc., Inc.*, 216 S.W.3d at 305. Therefore, summary judgment on this issue is not warranted.

## 2.      Timely Notice of Claims

Federal Insurance also argues that it had no duty to defend under the Policy because FBLLC failed to provide timely notice of the Discrimination Complaint and the EEOC Charges. The Policy requires that "[a]ny Insured shall, as a condition precedent to exercising their rights under any Liability Coverage Section, give to the Company written notice as soon as practicable of any Claim." Policy, p. 10. FBLLC provided notice of the Discrimination Complaint on May 2, 2006. The Discrimination Complaint was filed on November 23, 2005, and the Discrimination Plaintiffs filed their EEOC Charges in late May of 2005. Federal Insurance claims that waiting almost one year from the EEOC Charges and several months from the filing of the Discrimination Complaint does not constitute notice as soon as practicable and justifies Federal Insurance's decision to deny a defense. FBLLC does not provide any reason for the delay in providing notice of the Discrimination Complaint or the EEOC Charges except for a brief mention in a declaration that Mr. Clark did not realize FBLLC might have coverage for the Discrimination Claim until a meeting on April 28, 2006. *See* [Court Doc. No. 37, Declaration of Robert Davidson ("Davidson Decl."), ¶ 9].

The first question to be addressed is whether the delay in informing Federal Insurance of the Discrimination Complaint or the EEOC Charges constitutes a failure to provide notice "as soon as practicable." It is clear that the Policy makes such notice a "condition precedent" to coverage. Policy, p. 10. A Tennessee appellate court summarized the meaning of practicability as determined in Tennessee and other states:

> In order to determine whether notice was given 'as soon as practicable' some understanding of the term as well as the manner in which it should be construed must be established as a premise. We are of the opinion the case of *Young v. Travelers Ins. Co.*, 119 F.2d 877 (5th Cir. 1941) adequately sets forth the premise

as follows:

> 'The time words in the clause, 'as soon as practicable' are not words of precise and definite import. They are roomy words. They provide for more or less free play. They are in their nature ambulatory and subject under the guiding rule, to the impact of particular facts on particular cases. They do not in terms require immediate notice or notice within a particular number of days. They may not be so construed. They do not even provide for notice 'as soon as possible.' In terms, they require notice 'as soon as practicable' and they must be construed as requiring the notice within a reasonable time under all the circumstances, to effectuate the objects and purposes of the notice clause.'

> When that duty of an insured to notify 'as soon as practicable' arises has been described in *Osborne v. Hartford Acc. and Indemnity Co.*, . . . as follows:
> 'It is also elemental that the duty to notify does not arise until an ordinarily or reasonably prudent man would have known (c) of the occurrence of the event and (d) that the event might reasonably be expected to produce a claim against the insurer.'

*Transamerica Ins. Co. v. Parrott*, 531 S.W.2d 306, 312-13 (Tenn. Ct. App. 1975) (quoting

*Osborne v. Hartford Acc. and Indemnity Co.*, 476 S.W.2d 256, 265 (Tenn. Ct. App. 1972)).

Tennessee courts have also determined that "[t]he term 'practicable' not only means reasonable,

but has the additional connotation of what might be termed common or 'horse' sense. Being

practicable about a matter means eliminating the purely formal or useless acts which serve no

real or valid purpose." *Parrott*, 531 S.W.2d at 314. In *Pennsylvania, etc. Ins. Co. v. Horner*,

281 S.W.2d 44 (Tenn. Sup. Ct. 1955), the Tennessee Supreme Court determined that a 5-month

delay in providing notice of an automobile collision did not satisfy the requirement that the

insured give notice as soon as practicable under the insurance policy. *Id.* at 46.

In *Sohm v. United States Fidelity & Guaranty Co.*, the Sixth Circuit, applying Tennessee

law, determined that a six month delay in providing notice of a potential claim did not comply

with an insurance provision requiring notice as soon as practicable. 352 F.2d 65 (6th Cir. 1965).

The court determined:

-19-

> It is the finding of the Court that the delay on the part of the Appellant, in the absence of circumstances beyond his control, in complying with the terms of the policy to furnish written notice to the Appellee 'as soon as practicable' was a breach of the policy provisions requiring such written notice to be furnished. The inquiry into whether the Appellee was prejudiced by the delay is irrelevant 'for if the giving of notice was a condition precedent to the right of recovery, the failure to give it prevented any liability from attaching.'

*Id.* at 68-69 (citations omitted). In *Rural Ed. Ass'n v. American Fire & Cas. Co.*, another Sixth Circuit decision interpreting Tennessee law, the court decided that a failure to give notice of a claim for almost seven months did not comply with the policy's requirement that notice be given as soon as practicable. 207 F.2d 596 (6th Cir. 1953).

In *Allstate Ins. Co. v. Wilson* the Tennessee appellate court considered whether a five-month delay in notice to an insurance company was reasonable under the terms of the policy which required notice to be provided "promptly." 856 S.W.2d 706, 707-709 (Tenn. Ct. App. 1992). In affirming the trial court's determination that the insurance company had no duty to pay for the claim, the court noted that " '[a] requirement in a policy for "prompt" or "immediate notice" or that notice must be given "immediately" "at once", "forthwith", "as soon as practicable", or "as soon as possible" generally means that the notice must be given within a reasonable time under the circumstances of the case.' " *Id.* (quoting 44 Am.Jur.2d, Insurance, § 1330); *see also Griffith Motors, Inc. v. Compass Ins. Co.*, 676 S.W.2d 555 (Tenn. Ct. App. 1983) (notice provided nine moths after the event that could give rise to a claim was not notice "as soon as practicable" under the terms of the policy).

The parties do not dispute that the Discrimination Plaintiffs filed their lawsuit in November of 2005 and that FBLLC did not provide notice of the claim to Federal Insurance until May of 2006. It is also undisputed that the EEOC Charges were filed in May of 2005. The

Policy defines an Employment Claim as including a claim of discrimination filed with the

EEOC. *See* Policy, p. 35. The court concludes that the five to six month delay from the filing of

the Discrimination Complaint does not constitute notice as soon as practicable under Tennessee

law. Waiting until lawyers have been defending a lawsuit for almost six months simply does

not constitute "notice within a reasonable period of time under the circumstances of the case."

*See Wilson*, 856 S.W.2d at 709. It appears clear that a reasonably prudent man would have

understood the potential for a claim and the need to inform the insurance company well before

almost a year had passed since the filing of EEOC Charges and almost six months had passed

since the actual filing of the Discrimination Complaint. FBLLC has pointed to no case law in

Tennessee that would suggest that such a time frame constitutes notice "as soon as practicable."

FBLLC's failure to comply with the strict notice requirements of the Policy does not end

the inquiry, however. The court must also determine whether FBLLC's failure to supply timely

notice forfeits its right to coverage under the Policy. There are two general types of liability

insurance policies:

> Most policies of liability insurance may be characterized as either occurrence
> policies or claims-made policies. Occurrence policies protect policyholders
> against incidents that occur while the policy is in force, even if the claim that
> arises from that incident is not filed until after the policy expires or is terminated.
> Claims-made policies protect policyholders against claims that are filed while the
> policy is in force, even if the incident giving rise to the claim occurred before the
> policy was executed.

*Pope v. Leuty & Heath, PLLC*, 87 S.W.3d 89, 93 (Tenn. Ct. App. 2002). In this case the Policy

clearly covered only claims made during the policy coverage period, but it also excludes

coverage for prior acts which arose before the coverage period, so that in effect, the Policy is a

claims-made policy with some elements of an occurrence policy. Thus, the Policy is a hybrid of

-21-

a claims-made and an occurrence policy.

FBLLC claims that it does not matter whether it provided notice as soon as practicable because its failure to provide notice to Federal Insurance did not prejudice the insurance company. In *Alcazar v. Hayes* the Tennessee Supreme Court addressed whether the failure to provide timely notice forfeited the insured's right to coverage in a case involving a motor vehicle accident and uninsured motorist coverage. 982 S.W.2d 845, 847 (Tenn. Sup. Ct. 1998). The court questioned whether "an insured, who fails to comply with the notice provision of his or her insurance policy, may nevertheless enforce the policy in the event that the insurer has not been prejudiced by the delay." *Id.* at 848. The insurance policy in that case required notice as soon as possible after the accident. *Id.* The Supreme Court first reviewed the traditional approach under Tennessee law:

> For years Tennessee law has consistently adhered to the traditional common law approach that:
>
> (1) notice is a condition precedent to recovery under the policy and (2) there need not be any showing of prejudice. . . . One commentator has noted:
> The purpose of the policy provision requiring the insured to give the company prompt notice of an accident or claim is to give the insurer an opportunity to make a timely and adequate investigation of all the circumstances. . . . Such a requirement tends to protect the insurer against fraudulent claims, and also against invalid claims made in good faith. If the insurer is given the opportunity for a timely investigation, reasonable compromises and settlements may be made, thereby avoiding prolonged and unnecessary litigation.

982 S.W.2d at 849 (quoting 1 Eric Mills Holmes & Mark S. Rhodes, *Appleman on Insurance* § 4.30 (2d ed. 1996)).

Following review of the traditional rule, the Tennessee Supreme Court explored the modern trend with respect to notice provisions:

> In recent years a "modern trend" has developed, and a vast majority of

jurisdictions now consider whether the insurer has been prejudiced by the
insured's untimely notice.  Although these courts have enumerated various public
policy justifications to support this shift, a review of these cases indicates that
three rationales are particularly pervasive: 1) the adhesive nature of insurance
contracts; 2) the public policy objective of compensating tort victims; and 3) the
inequity of the insurer receiving a windfall due to a technicality.

*Id.* at 850.  The court quoted from a Pennsylvania Supreme Court case noting that "'[a]n

insurance contract is not a negotiated agreement; rather its conditions are by and large dictated

by the insurance company to the insured.   The only aspect of the contract over which the insured

can 'bargain' is the monetary amount of coverage.'" *Id.* (quoting *Brakeman v. Potomac Ins. Co.*,

371 A.2d 193, 196 (Pa. Sup. Ct. 1977)).

> In agreeing to adopt the modern trend, the Supreme Court indicated:

> We believe that the public policy of Tennessee is consistent with the
> overwhelming number of our sister states that have adopted the modern trend. . . .
> we agree with our sister states that it is inequitable for an insurer that has not been
> prejudiced by a delay in notice to reap the benefits flowing from the forfeiture of
> the insurance policy.  In light of the adhesive nature of such contracts as well as
> our inclination to construe these contracts against the drafter/insurer, we believe
> that this State's public policy disfavors the ability of an insurer to escape its
> contractual duties due to a technicality.

982 S.W.2d at 852.

In determining the burden of proof requirements for a failure to provide timely notice, the

Tennessee Supreme Court in *Alcazar* ruled that "when an insured does not provide timely notice

to its insurer in accordance with the terms of the policy, a presumption of prejudice to the insurer

will arise.  The insured is entitled, however, to rebut this presumption by presenting competent

evidence that the insurer was not prejudiced by the delay." *See Pope v. Leuty & Heath, PLLC*,

87 S.W.3d 89, 94 (Tenn. Ct. App. 2002) (citing *Alcazar*, 982 S.W.2d at 856).

In *American Justice Ins. Co. v. Hutchison* the Tennessee Supreme Court addressed two

questions certified to it by the United States District Court. 15 S.W.3d 811 (Tenn. Sup. Ct.

2000). One question was "[w]hether a standard liability policy is automatically forfeited when

the insured fails to comply with the policy's notice provision, regardless of whether the insurer

has been prejudiced by the delay." *Id.* at 812. In *Hutchison* the Tennessee Supreme Court

expanded the *Alcazar* prejudice rule to general liability policies. *Id.* at 817. In extending the

*Alcazar* rule, the Supreme Court declined to apply the rule only to "occurrence" policies. *Id.* at

818 n.5. It noted that the National Association of Independent Insurers "also asks this Court to

apply this rule only to 'occurrence' policies, and not to 'claims made' policies. They point out

that the instant case involves an 'occurrence' policy. This question was not certified to us by the

District Court and, accordingly, will not be addressed." *Id.*

However, a Tennessee appellate court has declined to extend the prejudice rule to claims-

made policies. *See Pope*, 87 S.W.3d at 95 (declining to extend *Alcazar* prejudice analysis to a

claims-made policy); *see also, Wallace v. General Star Indemnity Co.*, No. 1:06cv106, 2007 WL

1624071 (E.D. Tenn. June 1, 2007) (declining to apply *Alcazar* prejudice rule to hybrid policy).

However, in *Pope* it was "undisputed that [the insured] did not report the potential claim against

them within either the policy period or the extended claim reporting period." 87 S.W.3d at 93.

The insured sent the first written notice of a possible claim over six months after the end of the

policy period. Similarly, in *Wallace* the parties did not dispute that the insured did not provide

notice of the cause of action against him until two days after the expiration of the professional

liability insurance policy. 2007 WL 1624071 at *2. The policy at issue clearly provided that the

written report of the claim must be received by the insurer prior to the expiration of the policy

period. *Id.* As in this case, the policy in *Wallace* was a hybrid policy in which both the report of

-24-

the claim and the occurrence leading to the claim needed to arise during the policy period. *Id.* at *5. In *Wallace* the district court relied on *Pope* in holding that the prejudice rule stated in *Alcazar* did not apply to a hybrid policy where the insured clearly did not provide notice of the claim during the policy period. *Id.* at *6. The district court determined that "the majority of courts in other jurisdictions refuse to apply the notice-prejudice rule to claims-made insurance policies. Some of these cases reason that 'requir[ing] a showing of prejudice for late notice would defeat the purpose of 'claims-made' policies, and in effect, change such a policy into an 'occurrence' policy.'" *Id.* at *5 (citing *Salt Lake Toyota Dealers Ass'n v. St. Paul Mercury Ins. Co.*, No. 2:05-CV-497 TS, 2006 WL 1547996 at *4 n. 39 (D. Utah June 6, 2006) and quoting *Hirsch v. Texas Lawyers' Ins. Exch.*, 808 S.W.2d 561, 565 (Tex. Ct. App. 1991)).

However, the facts in this action are distinguishable from the situations in both *Pope* and *Wallace*. In this case there is a genuine issue of material fact regarding whether the alleged discrimination occurred after the policy period began and the claim, while not reported as soon as practicable, was reported during the policy period. Thus, the concern addressed in *Wallace*– that requiring a showing of prejudice would defeat the purpose of the claims-made policy– does not exist here. *See e.g., Financial Indust. Corp. v. XL Specialty Ins. Co.*, 285 S.W.3d 877 (Tex. Sup. Ct. 2009).

The Texas Supreme Court recently addressed the following certified question from the Fifth Circuit:

> Must an insurer show prejudice to deny payment on a claims-made policy, when the denial is based upon the insured's breach of the policy's prompt-notice provision, but the notice is nevertheless given within the policy's coverage period?

*XL Specialty Ins. Co.*, 285 S.W.3d at 877. In *XL Specialty Ins. Co.* the insured waited seven

-25-

months after suit was filed to provide notice of the claim to the insurer, and the parties did not dispute that notice was not provided "as soon as practicable" as the policy required. *Id.* at 878. The parties further did not dispute that the insurer was not prejudiced by the delay in notice. The Texas Supreme Court held that "an insurer must show prejudice to deny payment on a claims-made policy, when the denial is based upon the insured's breach of the policy's prompt-notice provision, but the notice is given within the policy's coverage period." *Id.* at 879.

On the very same day that the ruling in *XL Specialty Ins. Co.* was issued, the Texas Supreme Court issued its decision in *Prodigy Comm. Corp. v. Agricultural Excess & Surplus Ins. Co.*, a case with similar facts to the *XL Specialty Ins. Co.* case. 288 S.W.3d 374 (Tex. Sup. Ct. 2009). In *Prodigy Comm. Corp.*, the insured did not give notice of a claim "as soon as practicable" under the terms of a claims-made D&O liability policy, but the insurer was not prejudiced by the delay in notice and the notice was provided during the policy period. The court concluded:

> In a claims-made policy, when an insured gives notice of a claim within the policy period or other specified reporting period, the insurer must show that the insured's noncompliance with the policy's "as soon as practicable" notice provision prejudiced the insurer before it may deny coverage. Here, it is undisputed that [the insured] gave notice of the FlashNet lawsuit before the ninety-day cutoff. Even assuming that [the insured] did not give notice "as soon as practicable," [the insurer] was not denied the benefit of the claims-made nature of its policy as it could not "close its books" on the policy until ninety days after the discovery period expired. . . . Accordingly, we conclude that [the insured's] obligation to provide [the insurer] with notice of a claim "as soon as practicable" was not a material part of the bargained-for exchange under this claims-made policy.

288 S.W.3d at 382. The court held that the insurer could not deny coverage based on the failure to provide notice as soon as practicable where the insurer admitted it was not prejudiced by the delay and notice was provided within the coverage period. *Id.*

The court concludes that the situation present in this action is more akin to the situations confronting the Texas Supreme Court in *Prodigy Comm. Corp.* and *XL Speciality Ins. Co.* than the situations in *Pope* and *Wallace*. In this case FBLLC's claim for coverage arguably fit into the narrow parameters of both the claims-made aspects and the occurrence aspects of the Policy. It provided notice of the Discrimination Complaint within the Policy period, and as described *supra,* the alleged discrimination may have occurred during the Policy period. Therefore, requiring Federal Insurance to provide coverage for the Discrimination Complaint does not deprive the Defendant of the benefit of its bargain. Unlike the situations in *Pope* and *Wallace*, Federal Insurance had yet to "close the books" on the Policy because the Policy period was still in effect when the claim was made. Thus, forcing Federal Insurance to provide coverage does not convert its Policy from a claims-made policy into an occurrence policy because the claims-made part of the Policy is left intact, despite the late notice.

The Tennessee Supreme Court has expressly declined to rule on the issue before the court here. *See Hutchison*, 15 S.W.3d at 818 n.5. However, the policy reasons for the *Alcazar* prejudice rule appear to apply in the situation before this court in this case. *See* 982 S.W.2d at 850-52. The court is especially attuned to the possibility that allowing Federal Insurance to escape liability in this case would allow the insurer to deny coverage on the basis of a technicality, even though the most significant terms of the Policy were satisfied – namely that the alleged discrimination possibly occurred during the Policy period and the claim was reported during the Policy period. The Policy provides only narrow coverage that includes both claims-made elements and occurrence based elements, and FBLLC's claim arguably manages to fit within those narrow parameters. To allow Federal Insurance to deny coverage would appear to

grant it a windfall.

The court does not find Tennessee law clear on this issue. The court is further aware of Sixth Circuit precedent interpreting Tennessee law regarding notice provisions. *See Union Planters Bank v. Continental Cas. Co.*, 478 F.3d 759, 766 (6th Cir. 2007) (noting that "Tennessee law does not give courts latitude to excuse compliance with notice provisions in insurance policies"). The Sixth Circuit in *Union Planters* noted that:

> *Alcazar*, however, does not announce an across-the-board exception to the general rule–either by its terms or by its rationale. The case arose in the context of an occurrence-based policy. Such policies, the court observed, frequently amount to "contract[s] of adhesion," and enforcement of the rule in that setting would produce an "undeserved windfall" for insurers. Consistent with this rationale, the Tennessee courts have limited the application of this exception to occurrence-based policies.

478 F.3d at 766 (citations omitted).

However, based on the policy reasons behind the decision in both *Alcazar* and *Hutchison*, this court concludes that it is entirely likely that, if faced with this situation, the Tennessee Supreme Court might accept the recent reasoning of the Texas Supreme Court and require a showing of prejudice for denial of coverage in a claims-made policy or a hybrid policy when the notice of the claim is untimely but still provided during the policy period. *See Prodigy Comm. Corp.*, 288 S.W.3d 374; *XL Specialty Ins. Co.*, 285 S.W.3d 877.

Further, the court concludes that there is a genuine issue of material fact regarding whether Federal Insurance was prejudiced by the delayed notice. It is clear that FBLLC had outside counsel representing its interests as early as the time of the EEOC Charges. *See* [Court Doc. No. 35-3, Affidavit of John Y. Elliott, III ("Elliott Aff."), ¶ 4]. In addition, Federal Insurance does not dispute that FBLLC's outside counsel, attorneys for Miller & Martin, were on

-28-

Federal Insurance's approved list of counsel. Davidson Decl., ¶ 11; Elliott Aff., ¶ 6. FBLLC obtained dismissal of the claims against it at the summary judgment stage, and its outside counsel averred that he would not have handled the case differently if Federal Insurance had retained his firm. Elliott Aff., ¶ 7. Therefore, because the court concludes that the law is not clear regarding the forfeiture of coverage due to the untimely notice during the Policy period and there is little evidence of prejudice to Federal Insurance based on the delay, the court will **DENY** Federal Insurance's motion for summary judgment on this issue. The parties may wish to consider moving for an order to certify this particular question of law to the Tennessee Supreme Court pursuant to Rule 23 of the Tennessee Supreme Court Rules.

### 3. "Tail" Coverage for FBLLC

FBLLC argues that it should have coverage through the Election of Extended Reporting Period Endorsement purchased for FBCI. However, the document demonstrating the purchase of such "tail" coverage does not indicate that FBLLC is the insured. *See* [Court Doc. No. 35-4]. Instead, the "tail" coverage indicates that FBCI was the insured. Under Tennessee law, insurance coverage is personal to the individual insured. For instance in *American Steam Laundry Co. v. Hamburg-Bremen Fire Ins. Co.*, the Tennessee Supreme Court noted that with respect to an insurance policy:

> The original transaction was with [the original insured], and must be treated as a transaction with him, although he used merely a trade-name instead of his own name. The property having passed to other persons without obtaining the consent of the insurance company, and the transfer of the policy, the property was no longer protected. A fire insurance policy is a contract of personal indemnity made with the individual protected, and does not go with the property as an incident thereto to any person who may buy that property. If it goes at all, it goes as a matter of contract for the transfer of the policy.

113 S.W. 394, 395 (Tenn. Sup. Ct. 1908). *See also, Estate of Cartwright v. Standard Fire Ins.*

*Co.*, No. M2007-02691-COA-R3-CV, 2008 WL 4367573, *2 (Tenn. Ct. App. Sept. 23, 2008) (noting that "[t]he contract of insurance is also purely a personal contract between the insured and the insurance company, and does not attach to or run with the title to the insured's property absent an agreement for the transfer of the policy"); *Phoenix Mut. Life Ins. Co. v. Aetna Ins. Co.*, 59 S.W.2d 517, 519 (Tenn. Sup. Ct. 1933) (noting that "[a] contract of insurance is a contract personal in its nature, and the insurer has the right to determine for itself whether it shall become obligated to a grantee of the assured or not").

In this action there is no indication in the record that the Endorsement indicating the Election of Extended Reporting Period was issued to anyone other than FBCI. *See* [Court Doc. No. 35-4]. Therefore, FBLLC does not have a right to any coverage that was to be provided by Federal Insurance to FBCI during the extended coverage period.

## B.      Bad Faith Failure to Pay Claim

Tennessee law provides that

> The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; . . .

Tenn. Code Ann. § 56-7-105(a).

To demonstrate the elements of a bad faith failure to pay, a plaintiff must show: " '(1) that the insurance policy, by its terms, became due and payable; (2) that a formal demand for payment was made; (3) that [the insured] waited sixty days after making demand before filing

suit; and (4) that [the insured's] refusal to pay was not in good faith.'" *Sowards v. Grange Mut.*

*Cas. Co.*, No. 3:07cv0354, 2008 WL 3164523, *8 (M.D. Tenn. Aug. 4, 2008) (quoting

*Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007) and citing *Palmer v.*

*Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986)). In addition, "if an

insurer asserts a defense in good faith, the bad faith penalty may not be imposed even if the

defense is unsuccessful." *Sowards*, 2008 WL 316 4523 at *8 (citing *Palmer*, 723 S.W.2d at

126). To sustain a claim for failure to pay in bad faith a plaintiff must demonstrate "there were

no legitimate grounds for disagreement about the coverage of the insurance policy." *Zientek. v.*

*State Farm Int'l Servs.*, No. 1:05cv326, 2006 WL 925063, *4 (E.D. Tenn. Apr. 10, 2006) (citing

*Marlin Financial & Leasing Corp. v. Nationwide Mut. Ins. Co.*, 157 S.W.3d 796, 812-13 (Tenn.

Ct. App. 2004)).

 The court must dismiss the bad faith failure to pay claim because Federal Insurance has

asserted good faith defenses to liability, even if such defenses may be ultimately unsuccessful.

The good faith defenses include the existence of the prior acts provision and the arguable failure

to comply with the notice requirements in the Policy. The court concludes that there were

legitimate grounds for disagreement about whether Federal Insurance had a duty to pay for

FBLLC's defense of the Discrimination Complaint. For this reason, FBLLC's bad faith failure

to pay claim will be **DISMISSED**.

### C. Tennessee Consumer Protection Act Claim

 Federal Insurance also moves for summary judgment on Plaintiff's TCPA claim. The

TCPA provides that:

> [a]ny person who suffers an ascertainable loss of money or
> property, real, personal, or mixed, or any other article, commodity,

-31-

or thing of value wherever situated, as a result of the use of
employment by another person of an unfair or deceptive act or
practice declared to be unlawful by this part, may bring an action
individually to recover actual damages.

Tenn. Code Ann. § 47-18-109(a)(1).  The TCPA lists a range of various specific unfair and

deceptive practices in Tenn. Code Ann. § 47-18-104.

While Tenn. Code Ann. § 47-18-104 provides a list of unfair and deceptive practices, it

also contains a "catch-all" provision that states that "[e]ngaging in any other act or practice

which is deceptive to the consumer or to any other person" is unlawful.  Tenn. Code Ann. § 47-

18-104(b)(27).  The Tennessee Supreme Court has held that this catch-all provision may apply to

insurance companies and that the TCPA does not explicitly exempt insurance companies from its

provisions.  *See Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 922, 925 (Tenn. Sup. Ct. 1998)

(citing Tenn. Code Ann. § 47-18-111).  The court in *Myint* determined that exempting insurance

companies from the coverage of the TCPA would frustrate the purposes of the Act.  *Id.* at 925-

26.  It held that "[w]e consider the Insurance Trade Practices Act, the bad faith statute, and the

Consumer Protection Act as *complementary* legislation that accomplishes different purposes, and

we conclude, accordingly, that the acts and practices of insurance companies are generally

subject to the application of all three."  *Id.* at 926.

Other state and federal court decisions have made clear that for the TCPA to apply to the

denial of insurance claims, the insured must allege that the insurer violated the terms of the

policy, deceived the insured about the terms of the policy or acted unfairly in some other way.

*See e.g., Nautilus Ins. Co. v. The In Crowd, Inc.*, No. 3:04-0083, 2005 WL 2671252 (M.D. Tenn.

Oct. 19, 2005); *Parkway Assoc., LLC v. Harleysville Mutual Ins. Co.*, 129 F. App'x 955, 960-61

(6th Cir. 2005) (affirming district court's award of summary judgment where plaintiff failed to

allege that defendant insurer misled or deceived it).  Further, a mere denial of an insurance

claim, absent any deceptive, misleading of unfair act does not violate the TCPA.  *See e.g.,*

*Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007) (affirming award of

summary judgment for insurer on plaintiff's TCPA claim where at worst insurer's conduct

amounted to an "erroneous denial" of a claim); *Stooksbury v. American Nat. Property and Cas.*

*Co.*, 126 S.W.3d 505, 520 (Tenn. Ct. App. 2003) (reversing trial court award of damages

pursuant to the TCPA where "no material evidence" existed "to support the jury's conclusion

that Defendant engaged in deceptive or unfair acts"); *Ginn v. American Heritage Life Ins. Co.*,

173 S.W.3d 433, 445-46 (Tenn. Ct. App. 2004) (reversing jury verdict on plaintiff's TCPA claim

where insurer simply maintained good faith, although mistaken, belief that plaintiff materially

misrepresented her husband's health).

FBLLC's TCPA claim must be dismissed because it cannot demonstrate that Federal

Insurance's mere denial of the claim was deceptive or unfair.  Federal Insurance was entitled to

attempt to enforce both the prior acts provision, as well as the notice provision.  Federal

Insurance's motion for summary judgment on the TCPA claims will be **GRANTED**.

## IV.  Conclusion

As explained *supra*, Federal Insurance's motion for summary judgment will be **DENIED**

in part and **GRANTED** in part.  Federal Insurance's motion for summary judgment on Plaintiff's

claim for breach of contract will be **DENIED**.  The parties should be prepared to proceed to trial

on this issue.  Federal Insurance's motion for summary judgment on Plaintiff's bad faith failure

to pay claim and its claim pursuant to the TCPA will be **GRANTED**.  The Plaintiff's claims for

bad faith failure to pay and violation of the TCPA will be **DISMISSED** with prejudice.  A

-33-

separate order will enter.

_____/s/ R. Allan Edgar_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE